**MOSKOWITZ COLSON**
**GINSBERG SCHULMAN**

Moskowitz Colson
Ginsberg & Schulman LLP

80 Broad Street, Suite 1900
New York, NY 10004

(212) 257-6455

www.mcgsllp.com

June 6, 2023

Hon. George B. Daniels
Senior United States District Judge
United States Courthouse
500 Pearl Street
New York, NY 10007

Re:     United States v. Jamarr Simmons
                      20 Cr. 57 (GBD)

Dear Judge Daniels:

Jamarr Simmons was a broken child from a broken and abusive home.   Like many other broken children from rough neighborhoods, Jamarr chose to seek refuge, structure, and role models by pledging allegiance to a gang. That desperate choice, made when he was just a child, led inexorably to the conduct for which he now faces sentencing.

As an adult who is finally reaching neuropsychological maturity, Jamarr can now comprehend the magnitude of the mistake he made when he joined the Bloods as a teenager, and he is determined and prepared to put that mistake and its consequences behind him.   This Court should give him the opportunity to do so by imposing a substantially below-Guidelines sentence.

## I.      The Advisory Sentencing Guidelines Range

As the Supreme Court has repeatedly explained, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Peugh v. United States*, 569 U.S. 530, 536 (2013) (*quoting Gall v. United States*, 552 U.S. 38, 49 (2007)). After calculating the appropriate Guidelines range, the Court must consider the § 3553(a) factors, make an individualized assessment, and impose a sentence that is"sufficient, but not greater than necessary" to meet the objectives of sentencing. *See* 18 U.S.C. § 3553(a); *Gall v. United States, supra.*

The Probation Department's calculation of the guidelines in the Presentence Investigation Report (the "PSR") is significantly higher than the range to which the parties stipulated.   For the reasons that follow, Probation's calculations are incorrect.   Further, Jamarr does not qualify as a career offender.

A.   The Guidelines Calculation in the PSR is Incorrect

Probation's calculation of the guidelines is incorrect and varies from the calculation to which the parties stipulated in the plea agreement in two significant ways.

The first error made by Probation concerns the managerial role enhancement pursuant to USSG §3B1.1(b).   Application Note 1 to USSG §2E1.1 specifically requires that all Chapter Three enhancements, including role enhancements, be applied when conducting the RICO offense level analysis.   But Probation applies the points *after* conducting the RICO analysis, which effectively double counts the enhancement and improperly raises Jamarr's offense level from 36 to 39.   The parties correctly calculated an offense level of 36, and that offense level should be applied when calculating Jamarr's advisory Guidelines range.

Second, Probation provides for a two-point increase to Jamarr's criminal history on the basis that he committed his offense while under a criminal justice sentence for parole. While Probation's approach is arguably permissible, it is respectfully submitted that Jamarr would not have accepted his plea if he had not understood his Guidelines range to be as calculated in the Plea Agreement, and the parties' understanding of, and agreement concerning, Jamarr's criminal history computation should control.   Notably, the Sentencing Commission has eliminated the rule requiring imposition of "status points" from its forthcoming November 2023 amendments to the Guidelines[1] as research shows they serve no predictive value with regard to recidivism or danger to the public.[2]   Under these circumstances, the Court should vary from the 2021 Guidelines by declining to impose two criminal history "status points" when calculating Jamarr's advisory Guidelines range.

B.   Jamarr is Not a Career Offender

The Government and Probation incorrectly assert that Jamarr is a "Career Offender" pursuant to USSG §4B1.1.   Section 4B1.1 applies only when a defendant has two prior convictions for "either a crime of violence or a controlled substance offense."   Jamarr has two prior convictions, for Attempted Robbery in the Second Degree and for Robbery in the Second Degree, both under New York law.   Attempted Robbery under New York law is not a crime of violence for purposes of the Guidelines, and the "Career Offender" enhancement is therefore inapplicable.

    1.   Attempted New York robbery does not have "as an element the use, attempted use, or threatened use of physical force against the person of another."   U.S.S.G. § 4B1.2(a)(1).

In *United States v. Taylor*, 142 S. Ct. 2015 (2022), the Supreme Court ruled that attempted Hobbs Act robbery does not have "as an element the use, attempted use, or threatened

---

[1]  United States Sentencing Commission, "Adopted Amendments (Effective November 1, 2023)" (*available at* https://www.ussc.gov/guidelines/amendments/adopted-amendments-effective-november-1-2023).

[2]  United States Sentencing Commission, "Revisiting Status Points," June 27, 2022 (*available at* https://www.ussc.gov/research/research-reports/revisiting-status-points).

use of physical force against the person or property of another."   18 U.S.C. § 924(c)(3)(A). The Court explained its holding by way of a hypothetical scenario:

> Adam tells a friend that he is planning to rob a particular store [and] . . . drafts a note—"Your money or your life"—that he plans to pass to the cashier.   The note is a bluff, but Adam hopes its implication that he is armed and dangerous will elicit a compliant response. When the day finally comes and Adam crosses the threshold into the store, the police immediately arrest him.   It turns out Adam's friend tipped them off.
>
> There is little question the government could win a lawful conviction against Adam for attempted Hobbs Act robbery.   After all, he intended to take property against the cashier's will by threat of force, and his actions constituted a substantial step toward that goal.   At the same time, this example helps show why attempted Hobbs Act robbery does not qualify as a crime of violence under the elements clause.   Adam did not "use" physical force.   He did not "attempt" to use such force—his note was a bluff and never delivered.   And he never even got to the point of threatening the use of force against anyone or anything.   He may have intended and attempted to do just that, but he failed.   Simply put, no element of attempted Hobbs Act robbery requires proof that the defendant used, attempted to use, or threatened to use force.

*Taylor*, 142 S. Ct. at 2021.

The same is true of attempted New York robbery.   "A person is guilty of an attempt" under New York law "when, with intent to commit a crime, he engages in conduct which tends to effect the commission of such crime."   N.Y. Penal Law § 110.00.   The intent to rob is just a mental state and thus entails no "use, attempted use, or threatened use of physical force."   U.S.S.G. § 4B1.2(a)(1).   And though the "conduct which tends to effect" a robbery "must 'carry the project forward within dangerous proximity to the criminal end,'" *People v. Bracey*, 41 N.Y.2d 296, 300 (1977) (citation omitted), "New York's 'dangerous proximity' requirement is virtually identical to the federal requirement that a defendant must take a 'substantial step.'"   *United States v. Celaj*, 649 F.3d 162, 170 (2d Cir. 2011).   Indeed, "the distinction between the federal and state requirements is 'more semantic than real.'"   *Id*. at 170-71 (citation omitted).   In any event, New York's highest court has made clear that attempted robbery can be committed without the "use, attempted use, or threatened use of physical force." § 4B.12(a)(1).

In *People v. Lamont*, 25 N.Y.3d 315 (2015), "at approximately 6:30 A.M., before the morning business hours, defendant and an accomplice appeared armed and masked at the rear door of a Wendy's fast-food establishment.   The two lone employees who were preparing to open heard loud knocking, and one of them checked the security camera and saw defendant and his accomplice outside the back, knocking on the door.   The employee did not let the two men in, but instead called his supervisor and 911." *Id*. at 317.   Police arrested Lamont outside the

Wendy's and recovered what had "appeared" on the security camera to be "handgun[s]" but proved to be only "BB guns."   *Id*. at 317.   The court affirmed his conviction for attempted robbery: the "BB gun supports an inference of intent to forcibly steal."   *Id*. at 321.   His plan was to use the BB gun to scare the employees into handing over money.   It didn't matter that he never got that chance to trick them: he "showed up masked and armed, carrying a backpack, seeking entry at 6:30 A.M. through a locked rear door not used by the public, with an escape vehicle conveniently parked nearby.   This fit the pattern common to an early morning robbery."  *Id*. at 322.

As with "Adam" in *Taylor*, Lamont "did not 'use' physical force.   He did not 'attempt' to use such force— his [plan to point a BB gun] was a bluff and never [realized].   And he never even got to the point of threatening the use of force against anyone."   142 S. Ct. at 2021.   Yet he was guilty of attempted robbery all the same—despite never using, threatening or attempting to actually use force.

Likewise, in *People v. Witkowski*, 455 N.Y.S.2d 608 (App. Div. 1982), police saw the defendant "casing" a store with an accomplice, telling him "we are going to hit this store" and "proceed[ing] into the vestibule" with "a toy pistol."   *Id*. at 610.   The court held his "intent to commit the specific crime"—attempted robbery—was "crystal clear," and that he had come "within dangerous proximity to the criminal end to be attained."   *Id*.   Yet he never used, threatened, or attempted to actually use physical force.

What Witkowski, Lamont and "Adam" all did was *attempt to threaten* force.   But that's beyond the scope of §4B1.2(a)(1), which is limited to the "use, attempted use, or threatened use of physical force."   Attempted New York robbery requires none of that.   And though the Second Circuit held otherwise in *United States v. Pereira-Gomez*, 903 F.3d 155 (2d Cir. 2018), it has been "'overruled, implicitly . . . , by the Supreme Court.'"   *United States v. Davis*, 726 F.3d 357, 368 (2d Cir. 2013) (citation omitted).   Given *Taylor*, and as *Lamont* and *Witkowski* confirm, attempted New York robbery does not categorically require the state to "prove the use, attempted use, or threatened use of force."   *Taylor*, 142 S. Ct. at 2025.

> 2.   The Guideline's commentary, which plainly conflicts with §4B1.2(a)(1), does not control.

"For purposes of this guideline," § 4B1.2's commentary says, a "crime of violence" includes "attempting to commit" a "crime of violence."   App. Note 1.   And *completed* New York robbery "is categorically a crime of violence under the force clause of U.S.S.G. § 4B1.2(a)(1)."   *United States v. Moore*, 916 F.3d 231, 240 (2d Cir. 2019).   Given this, the commentary deems *attempted* New York robbery a "crime of violence" as well.

Yet this is "'plainly . . . inconsistent' with § 4B1.2," which, as shown above, does not reach attempted New York robbery.   *Stinson v. United States*, 508 U.S. 36, 47 (1993) (citation omitted).   And where, as here, "commentary and the guideline it interprets are inconsistent in that following one will result in violating the dictates of the other, the Sentencing Reform Act itself commands compliance with the guideline."   *Id*. at 43.   Put simply, because attempted robbery in New York isn't "violent" under § 4B1.2, the commentary can't be used to reach the opposite result.

The rulings in *United States v. Tabb*, 949 F.3d 81 (2d Cir. 2020), and *United States v. Richardson*, 958 F.3d 151 (2d Cir. 2020), are not to the contrary. Those cases found no problem with § 4B1.2's commentary reaching drug conspiracies even though conspiracy isn't expressly listed as a "controlled substance offense" in the Guideline's text. "Section 4B1.2 defines 'controlled substance offense' as an offense under federal or state law 'that prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance.' To 'prohibit' means, among other things, 'to prevent [or] hinder.'" *Richardson*, 958 F.3d at 154-55 (citations omitted). "A ban on attempting to distribute a controlled substance," like a ban on conspiring to sell one, "'hinders' the distribution of the controlled substance." *Id*. at 155 (citation omitted).

But in contrast to the "prohibit" language in the "controlled substance offense" provision at § 4B1.2(b), the "crime of violence" clause requires an offense to have "*as an element* the use, attempted use, or threatened use of physical force." § 4B1.2(a)(1) (emphasis added). And attempted New York robbery has no such element: all that's required is intent to rob plus some "conduct which tends to effect" a robbery, N.Y. Penal Law § 110.00, but which needn't be any actual, attempted or threatened force. *See Lamont*, *Witkowski*. Thus, unlike § 4B1.2(b), there's no language in § 4B1.2(a)(1) that licenses the commentary to reach crimes that don't have, "as an element," the use of force.

To paraphrase *Taylor*, if the Sentencing Commission "had wanted [§ 4B1.2(a)(1)] to do the kind of work the [commentary] supposes, it could have easily said so. For example, it might have swept in those [] crimes that require as an element 'the use or threatened use of force' *and* those 'that constitute an attempt to commit an offense that as such an element.' But that simply is not the law we have." 142 S. Ct. at 2022 (emphasis in original).

The plain text of § 4B1.2(a)(1) doesn't reach attempted New York robbery. As such, the commentary can't be used to sweep in that crime: doing so would be "'plainly . . . inconsistent' with § 4B1.2." *Stinson*, 508 U.S. at 47 (citation omitted). Accordingly, Jamarr's conviction for attempted New York robbery does not qualify as a "crime of violence" for purposes of the Guidelines, meaning Jamarr is not a "Career Offender."

## II.       18 USC 3553(a)(1): The History and Characteristics of the Defendant

To understand how Jamarr came to stand before the Court for sentencing in this case, one must first understand his extraordinarily tragic family and personal history, without which his present circumstances would doubtless be very different.[3]

---

[3] The social history and expert opinion set forth in this section and in the following section are derived from a confidential report prepared by Dr. Simone Gordon, D.S.W., L.C.S.W./R., a mitigation specialist retained by defense counsel, and from Dr. Gordon's communications with counsel regarding her findings and conclusions. Dr. Gordon conducted repeated face-to-face interviews with Jamarr, his relatives, and his friends, and she reviewed his legal, medical, and academic records (including the MDC medical records and forensic psychological evaluation performed by Dr. Sanford L. Drob, Ph.D. which are annexed hereto) in order to opine on potential mitigating factors and the defense's approach to sentencing. Relevant portions of Dr. Gordon's report, and of her expert opinion, are summarized herein. However, because the report contains extensive sensitive information about nonparties and attorney work product not relevant to sentencing, it is not submitted herewith.

A.  Jamarr's Family Background

Jamarr is the product of generations of physical abuse and internalized racism. Growing up, he never knew anything about his father's side of the family, and indeed he never met or spoke with his father until he was an adult.  On his mother's side of the family, abuse ran rampant, and those family members who had darker skin often bore the brunt of it.

Jamarr's maternal grandmother, Dorothy, had two sisters, one of whom died during childhood. Dorothy's surviving sibling, Loretta, was treated by their parents as a "golden child," both literally and figuratively, because of her golden skin.   By contrast, Dorothy, whose skin was much darker, was raised to be ashamed of her dark skin and was treated by her parents as something less than human.

Dorothy met James Hearn, the boy who would eventually become Jamarr's grandfather, when she was in her early teens.  She was immediately smitten.  Like Dorothy, James had dark skin, although he came from an inter-racial family.   Dorothy's parents hated him, probably in part because of his skin color—and they refused to accept him as their daughter's partner or as a member of their family.

Dorothy became pregnant with Jamarr's mother, Theresa, when she was about seventeen.   Her parents' scorn and abuse became even more severe when they learned that she had gotten pregnant outside of wedlock by a partner with dark skin.   Theresa grew up hearing stories about the abuse and neglect her mother experienced as a child and teenager, and about the far more favorable treatment her light-skinned Aunt Loretta received.

Dorothy's relationship with her parents deteriorated further after Theresa was born and her parents refused to accept the child as a granddaughter because of her dark skin.   As Theresa explains,

> After I was born, my grandfather tried to push my mother down the stairs while she was holding me in her arms.  It was very hard growing up.  My grandparents preferred Aunt Loretta's children to us.[4]

After that incident, Dorothy retreated into drug addiction and largely cut off relations with her parents.   She and James had another three children and eventually married, but they never functioned as a family.   By the time Theresa was three or four years old, when her youngest sibling was an infant, Dorothy had become a full-blown heroin addict.   She and James had ended their romantic relationship, and James was no longer involved in his children's lives.

Theresa's earliest memories are of the neglect she and her siblings experienced as their mother Dorothy descended into addiction:

---

[4] Except where otherwise indicated, quotations in this submission are drawn from interviews given by Jamarr and his family members to Dr. Gordon, the defense mitigation specialist.

> I still can see the apartment… I was left alone in the apartment.   We all slept on a mattress on the floor.   There was no food in the house.   My baby brother cried all the time, I didn't know what to do.   He had a bottle filled with water.

Theresa and her siblings were eventually removed from their mother's custody for their own safety.   Theresa's paternal aunt, Natalie, came to the apartment to check on the children one day while Dorothy was away seeking heroin (or money to pay for heroin), but Natalie could not get in because Theresa, then age four, was too small to open the door.   After communicating with Theresa through the door, Natalie called the Administration for Children's Services, who came to the house soon after.   ACS tried to place the children with their maternal grandparents, but they refused to help because they disliked Dorothy, James, and the children, so Theresa and her siblings were transferred to foster care.   Theresa was sent to Crown Heights to live with her great aunt Susie, who was white, and her siblings were placed in another foster family elsewhere in the city.   Theresa did not see her mother again for almost twenty years, when they communicated one final time while Dorothy was on her deathbed.

Aunt Susie, who had lost a baby girl in childbirth, treated Theresa like a daughter. Theresa lived with her for almost thirteen years, which Theresa remembers as a period of much greater stability.   She always had enough to eat, a bed of her own with clean sheets and bedding, and clean clothes to wear to school.   Her home life was comfortable, and Aunt Susie was a loving and supportive "mother" to her.   Her father reestablished contact and visited frequently, and he learned from ACS where her siblings were living so that he could take her to see them.

Outside the home, things were more difficult.   Theresa was bullied by classmates who could not understand why she was being raised by a white woman.   She also had a very hard time academically.   Although she was not diagnosed at the time, she believes in retrospect that she likely suffered from Attention Deficit Hyperactivity Disorder ("ADHD").   She certainly exhibited many of the symptoms characteristic of that disorder: she was unable to sit still, had difficulty focusing, and was always disorganized.   She was required to repeat sixth grade because of poor academic performance but was never evaluated for ADHD or any learning disability and did not receive targeted educational support.   Nor did she receive any form of counseling for the trauma associated with the neglect and abandonment she suffered as a young child.

By the time Theresa turned fifteen, Aunt Susie was elderly and was increasingly unwell.   As Theresa began engaging in typical teenage rebellion, Aunt Susie's infirmity left her unable to control the young teenager or to keep her from acting out.   Without Aunt Susie's strong influence, Theresa became vulnerable to negative peer influences.   She began experimenting with marijuana and with boys.   Soon after, she met a "boy" named Jeffrey Squirewell, who said he was only a couple of years older than her, but who was actually a mature adult.   His exact age at the time remains something of a mystery.   Theresa knows only that he was "much older than eighteen," the age he claimed when they met.

Theresa dropped out of school when she was sixteen, partly so that she could spend more time with Jeffrey, but mostly because she had difficulty learning and concentrating and felt ready to be an "adult."   Soon after, she discovered that Jeffrey was much older than he

had pretended to be and that he was seeing other girls behind her back, so she broke off the relationship.   Meanwhile, Aunt Susie's health continued to deteriorate, and Theresa could not support herself through her part-time work as a babysitter.   When Aunt Susie became too ill to care for her, Theresa moved back to the Bronx to live with her father.

About three years later, when Theresa was nineteen, Jeffrey found out where she was and began to visit her in the Bronx.   He was very flattering, and they renewed their romantic relationship.   Not long after, Theresa became pregnant with Jamarr.   When she was five months pregnant, Theresa learned that all of Jeffrey's promises and apologies had been lies. He was still seeing other women, one of whom was also pregnant.   Theresa left Jeffrey a second time and had no further contact with him.

Jamarr was born on January 29, 1987.   Theresa brought her new baby home to her father's apartment, but they stayed only briefly before moving to a homeless shelter because she understood that, to qualify for affordable housing, she had to apply from a shelter.   Within a year, Theresa qualified for an apartment in the Morris Heights section of the Bronx, where she continues to live today.

Around the time she moved into the shelter, Theresa's estranged mother died of AIDS.   She does not recall how old she was at the time of her mother's death but does remember how strained their last conversation was, when she visited to say goodbye. "It was very awkward because we never had a relationship."

B.   Jamarr's Tragic Personal History

Jamarr suffered a life-changing head injury when he was just two years old. While outside walking with his mother, Jamarr was struck by an out-of-control bicyclist.   The bicycle wheel broke and the metal rim and spokes pierced Jamarr's forehead, causing an injury whose scar remains visible three decades later.   Before the accident, Jamarr was a cheerful, active, and intelligent child who was eager to learn and play, and he thrived under the care of his mother and grandfather, whom he came to think of as his father.   After it, however, he became withdrawn and isolated, and his behavior changed.   As Theresa recalls in her letter to the Court,

> When he was only 2 years old he had a very bad head injury. Somebody hit him with a bike.   The spike went through his forehead and he was never the same after that.   His thinking was off and he couldn't sit down for long.

(Ex. 1.)

Sadly, living in a shelter as an infant and toddler and the horrific accident he suffered soon thereafter were merely the first of many tragic circumstances that marked Jamarr's childhood and adolescence.   Around the time Jamarr suffered his traumatic head injury, his mother's boyfriend, Glen Johnson, moved into Theresa and Jamarr's apartment in the Bronx. From that moment on, Theresa and Jamarr's life radically changed.

Theresa had first met Glen while she and Jamarr were living in the shelter. Glen had two children, Anthony and Erica, who lived with their mothers, and Theresa found him both charming and supportive. They grew close quickly, but Glen "disappeared" without warning just a few months into their relationship. They reconnected when Jamarr was around fifteen months old. Theresa had obtained permanent housing, and Glen moved in with her.

Glen worked at Alexanders' Department Store, the legendary Bronx-based department store that was then a competitor to Macy's, Bloomingdale's, and Kmart. For sixty years, the company had been profitable. Beginning around the time Glen moved in with Theresa, however, the company's prospects dimmed. Competitive pressure ramped up just as Alexander's began cutting costs under pressure from its new majority shareholders, Donald Trump and Interstate Properties, who were far more interested in redeveloping the company's real-estate portfolio than operating a chain of department stores. The company laid off many of its employees, closed several stores, and never again turned a profit. Glen's employment became ever more precarious, and his behavior at home deteriorated dramatically. As Theresa explains,

> In the beginning, he was very nice. Then he changed. He was a violent, abusive man to me and to the children. He treated Jamarr worse than he treated our children. I was with him until Jamarr was around fourteen years old.

Theresa and Glen never married, but they lived together for almost thirteen years and had three children together. Their son Vynelle was born the day after Jamarr's second birthday, several months after Glen moved in with Theresa. After Vynelle was born, Theresa took him to visit her maternal grandmother, who asked her "where that 'Black' baby came from." Theresa never took any of her children to see her grandparents again.

Theresa's and Glen's first daughter, Tiffany, was born eleven months after Vynelle. Tiffany was born premature and underweight, and she had to remain in the neonatal intensive care unit. Her special needs as a premature baby absorbed much of Theresa's focus and attention, leaving little for Jamarr at a critical stage in his development and while he was still recovering from the massive head injury he had suffered only months earlier.

Their second daughter, Tyreese, was born twenty-two months after Tiffany. Thus, Jamarr lived with three younger half-siblings by the time he was six years old—and his mother, Theresa, was completely overwhelmed. Because all of her children were dark skinned, she could not rely on her mother's side of the family for support. Her father could offer little by way of support because his own partner, with whom he had children, was critically ill. Theresa's child-rearing responsibilities expanded even further when her father's partner died, and she took in her two half-siblings, Ramell Farmer Simmons and Christina Farmer Simmons, to raise as her own children. While Ramell and Christina are Jamarr's aunt and uncle, he has always thought of them as his younger siblings.

Glen, who had always been manipulative, became outright abusive after Tyreese was born. By then, Glen was no longer working at Alexander's. It is unclear how he made a

living at that time, although whatever he did apparently required him to be out of the house at odd hours and to carry a gun.

Theresa and Glen argued constantly.   Glen conducted affairs with numerous other women, but he went insane with jealousy and rage if Theresa showed any sign of independence.   He wouldn't let her leave the house without his permission, even to run errands. He searched her handbag whenever she left home or came back, and he flew into unpredictable fits of anger and violence against her.   Theresa believed until recently that she successfully hid the worst of the abuse from her children, but Jamarr was neither deaf nor blind.   Some of his earliest memories are of his mother's screams and cries, and of seeing her come out of the bedroom she shared with Glen "all bruised up."

Other than intrusive flashbacks to Glen's abuse of Theresa, Jamarr has very few memories of the period before he turned ten.   Accordingly, he does not remember exactly when Glen first struck him.   By the time of Jamarr's earliest memories, at ten or eleven, Glen struck him regularly him with his hands, belts, wires, and whatever other objects were handy.   Glen "hit all of us, he even hit the animals," explains Jamarr.   Glen was swift to anger, and he blamed Jamarr for anything that annoyed him, regardless of whether Jamarr was doing something wrong. Glen was abusive to all the children, but he treated Jamarr the worst.   As Theresa reports, "Glen referred to Jamarr as the 'Golden Child' because he was lighter skinned" than his half-siblings. "Glen also called Jamarr 'retarded'" because of the deficits he showed after his head injury and "hit him with belts and other objects."   Theresa called the police repeatedly but obtained no relief.   On several occasions Theresa took the kids to her father's house in an effort to escape from Glen.

Jamarr lived in fear that his stepfather would kill him, his mother, and his siblings.   One violent incident had a particularly strong effect on Jamarr, leading to post-traumatic flashbacks that have lingered for years.   Other members of Theresa's family were visiting for a social occasion, as were several of Glen's friends.   Glen became irrationally angry at his best friend and assaulted him in the middle of the party.   As Jamarr recalls, "I saw him almost choke his best friend to death in our living-room.   The man started to turn blue and purple, my uncle had to pull my father off him."

As in many abusive households, there were periods when Jamarr's home life was stable, and when Glen was not violent or abusive toward his wife and children.   These peaceful interludes were confusing to young Jamarr because life was so unpredictable.   Jamarr was unable to relax even during the peaceful times, maintaining a constant state of hypervigilance.

As the oldest male child in a cultural milieu that rewarded masculine strength, Jamarr felt obligated to protect his younger siblings, even when he didn't know how.   In her letter to the Court, Jamarr's sister Tyreese recalls how Jamarr tried to protect his mother and younger siblings, and how he taught her that their home life was not normal or appropriate:

> My brother help me with everything I needed to be the woman I am today with out him I don't know where I would be.   He gave me so much guidance, he told me how a man should treat women, he told me men respect women always an men don't hit on women.   This

> was major to him because we watched my mom get beat on almost every day.  JAMARR was scared but he never showed it.  Me an my siblings TIFFANY an VYNELL will scream an cry an JAMARR would talk to us he would put the tv on an if it got real bad he would take us for walks an bring us to a neighbor who lived in the building at the time.  My mom abuser was my father we was afraid of him an JAMARR got us through even my mom he was super supportive an loving to her as well.  I only realized now how much JAMARR Had on his plate at such a young age, It saddens me to see that he wasn't a big brother he was put in a predicament where he had to be the man of the house.  He really didn't have a childhood.  He never really got the chance to just be a kid.

(Ex. 2.)

Jamarr's hypervigilance continued even when he was at school or otherwise away from home.   In an interview with Dr. Gordon, Jamarr reported that when he was sitting in class, he was often troubled by intrusive thoughts about whether his mom and younger siblings were safe at home.   He obsessed about their safety and his own, recalling that "I was terrified all the time." He described flashbacks that interfered with his concentration:

> I used to see pictures in my mind of my stepfather hitting us while I was at school, it happened all the time.  I went home because I needed to protect my little brother and sisters.  Mom tried to stop him, but she couldn't protect herself.  [My sister Tiffany used to ask] "Why is mommy always crying and screaming?"

Troubled by intrusive thoughts about the violence that might be occurring at home in his absence, Jamarr sometimes skipped class in the middle of the day to go home and check on his mother and younger siblings.   When he was about eleven years old, Jamarr found Glen's gun and resolved to put an end to Glen's abuse once and for all.   He approached Glen where he had passed out and raised the gun but found himself emotionally unable to pull the trigger.   He does not recall how long he stood over Glen, crying in fear and frustration, before Theresa found him, took the gun away, and disposed of it.

Not only did Jamarr experience violence inside the home, but the neighborhood surrounding the family home was also rife with crime.   Jamarr saw his first shooting, at a local gas station, when he was just ten years old.   By the time he was thirteen, he realized that crackheads and drug dealers were all around him.   He recalls seeing crack vials in the streets:

> Drugs dealers and crackheads were everywhere. I saw people shooting up outside on the streets, in the stairs of my building. Drug dealers and users were always in the building.

When he was fourteen, Jamarr became the victim of random violence for the first time.   He and some friends were playing basketball in a local park when a gang member mistook one of his friends for a rival and opened fire at them.   Jamarr and his friends were unhurt but terrified.

Given the chaos, poverty and abuse of his home life and the violence and degradation to which he was exposed on the streets, it is not surprising that Jamarr struggled academically.   He felt unsafe at home, on the streets, and at school, where he frequently got in trouble with teachers who didn't understand why he could not concentrate or why he lashed out when challenged or insulted by his peers.   Physically smaller than most of his classmates but determined to present himself as "tough" and worthy of respect, Jamarr was continually bullied, and he lashed out to defend himself.   He had been conditioned to believe physical contact would rapidly escalate to violence and he found it difficult to relax and play with his peers.   If anyone came near him, he was reminded of how Glen used to hit him, and he became defensive.

Jamarr wanted desperately to please his mother by being "good" in school, but he found it hard to concentrate and attend to his lessons:

> I was constantly fidgeting. I couldn't sit still. At home my mother was always nagging at me because I left my clothes everywhere. Everything was a mess. All the teachers used to pick on me.

Both experts retained by the defense have described Jamarr's disruptive behaviors, such as hitting other children, interrupting classroom activities, not being able to sit still, and impulsivity, as common among children with ADHD and/or who have been exposed to traumatic stress.   Jamarr's difficulty concentrating made it hard for him to learn, and he had to repeat 4th grade due to poor grades and behavioral problems.   Despite his academic struggles and obvious difficulties in concentration, however, he was never provided with counseling, never evaluated for ADHD, with which he has subsequently been diagnosed, and never enrolled in special education or a tutoring program.

Because he was held back Jamarr was chronologically older than his peers in junior high school.   However, he was emotionally immature.   As he matured physically, his teachers and school administrators increasingly viewed him as a problem student who needed to be punished and controlled, rather than as a damaged child in need of nurturing and support. Unsurprisingly, given this lack of support, he continued to earn low grades.

Jamarr began junior high school at CES 82 in the Bronx, but he continued to have problems because of fighting and was eventually expelled.   Subsequently, he transferred to Diana Santos JHS 147, a ten-minute walk from his house.   His experience there was slightly better, but his attendance and performance suffered as his home situation deteriorated and Glen's abuse escalated.   He continued to worry about his siblings' safety and often skipped his morning and afternoon classes so that he could take them to and from school. He felt near constant anxiety and continued to suffer from flashbacks and intrusive thoughts.

Jamarr was introduced to marijuana when he was around thirteen years old. Initially, it made him sick and dizzy, but he soon discovered that it reduced his agitation and anxiety.   Within a few months of his first experiment with marijuana, he was smoking two or three blunts every day.

Around the time Jamarr finished junior high school, Theresa finally took him to see a psychiatrist at Bronx Lebanon Hospital, who diagnosed him with ADHD and a learning

disability.   Neither Jamarr nor Theresa remembers exactly what the disability was, but Jamarr remembers being told that it contributed to his difficulty remembering what he was taught and understanding what he read.   The doctor prescribed Ritalin and referred Jamarr to a psychiatrist at Bronx Care for continuing oversight and management of his ADHD.

Unfortunately, Jamarr was ill-equipped to manage his own treatment, and Theresa was far too overwhelmed with her other children and the abusive situation at home to ensure that he took his medication and attended treatment sessions.   Within a few months, Jamarr stopped seeing the psychiatrist—whom he remembers as "only want[ing] me to play with cubes" and providing no meaningful treatment—and stopped taking the Ritalin, which made him feel like a "zombie."   Neither Jamarr nor Theresa told either doctor about Glen's abuse, and neither doctor appears to have considered what factors other than a psychiatric condition might have contributed to Jamarr's behavioral issues.   Notably, nobody ever spoke to Jamarr about what his ADHD diagnosis meant until Dr. Gordon did so during her mitigation investigation.   Instead of being taught techniques to calm himself down and improve his focus, he was labelled as a kid with behavioral problems and given ineffective medication.

Because of his ADHD diagnosis, which is a disability under New York law, Jamarr was entitled to certain educational accommodations, including extra time to complete assignments and an individualized educational plan with services designed to help him succeed. However, as is often the case with minority students from troubled backgrounds, he was not provided with the accommodations he needed and was instead labeled as "disruptive" and warehoused in so-called "special education" classes that provided little education but were designed primarily to separate him from other students.[5]   Jamarr was labeled as a "bad kid" from an early age, rather than being correctly identified as a child with neurocognitive disabilities and special educational needs.

Tragically, by the time he reached adolescence, that label had become a self-fulfilling prophecy.   It should therefore come as no surprise that Jamarr was no more successful a student during his high school years than he had been when he was younger.   A transcript from Theodore Roosevelt High School dating from 2002-2005 indicates that Jamarr completed the ninth grade with failing grades, and that he frequently missed classes and examinations.   He was expelled from that school after his freshman year.

Theresa finally separated from Glen when Jamarr was about sixteen, around the time he was expelled from Roosevelt High School.   His "little brother" and biological uncle Ramell suffered a severe allergy attack the day after an incident in which Glen tried to choke Theresa while she was asleep.   This was the final straw for Theresa, who told a social worker at the emergency room where she took Ramell about the horrific abuse she had been suffering for fifteen years.   The social worker called the police, and an order of protection was entered.

After Jamarr was expelled from Roosevelt, he enrolled at the John V. Lindsey Wildcat Academy Charter School, previously known as the "Wildcat Academy" in the Bronx.

---

[5]   Jamarr's special education records and IEPs (Individual Educational Plans) were requested from the Department of Education but were not received.   Perhaps they were never done.   Neither Theresa nor Jamarr has any memory of him having received tutoring or other educational support services.

Jamarr was bullied by other students at Wildcat, who made fun of his appearance and called him names because of the visible scar he bears from his childhood head injury and because he wore rosary beads.

Jamarr's maternal grandfather, James Hearn, had been Jamarr's refuge during the worst of Glen's abuse, when Theresa would flee to her father's home with the children to escape from Glen.   Jamarr idolized him, and they were very close.   Sadly, James received a cancer diagnosis while Jamarr was in middle school.   As his health deteriorated, Theresa became James's caregiver, traveling to his home to care for him while the kids were in school.   Jamarr also went to check up on James, sometimes missing school to do so.   James's health continued to decline, and he moved into Theresa's apartment with the family shortly after Glen finally left. He died within months.

Jamarr was devastated by his grandfather's death.   As he explained to Dr. Gordon,

> It was the first time that I experienced the death of someone so close to me.   My grandfather was like a father to me.   He taught me many things.   He taught me how to play catch.   I used to visit him every weekend from the time I was little.   He ran a numbers spot in Harlem.   It was very hard for my mother, she took care of him. Now she was an orphan.

No one helped Jamarr process the loss of the only male anchor he had ever known.   He was grief-stricken and angry, but he couldn't talk to anyone about his feelings. Once again, his behavior and grades plummeted.   In the aftermath of his grandfather's death, Jamarr dropped out of Wildcat and transferred to a vocational school for individuals with disabilities.   But he was unable to complete the GED program at that school before he was arrested and incarcerated on a charge of Attempted Robbery in the Second Degree.   He pleaded guilty to that offense, and to a separate charge of Robbery in the Second Degree, on the same day in 2007, and he was imprisoned until 2017.

Sadly, Jamarr's trauma and pattern of tragic losses continued throughout his present federal incarceration.   Jamarr has always loved children.   His closest friend, Ashley Guity, credits Jamarr with saving her life by encouraging her to finish high school and get a job, when she was sixteen years old.   When they first met, Ashley had just dropped out of school in order to raise her infant son, Jovan.   Although their relationship was only briefly romantic, Ashley later described Jamarr as "the love of her life."   As she recalled in her interview with Dr. Gordon:

> Jamarr encouraged me to go back to school. I used to take my son to his mother's house so she could look after him while I went back to school.   We were like family.   Jamarr was like a "pops" to my son.   Everyone thought that [my son] was his kid because we spent so much time together, but he was not.

In her letter to the Court, Ex 6 hereto, Ashley describes Jamarr as "a good stepdad" to her son, and recalls the help he provided when she had nobody else to help her raise her son while she tried to finish high school.

Jamarr became a father himself in January 2020, just weeks before his arrest in this case.   Although he and the child's mother, Tristina Johnson, were not in a significant relationship and had split up before he got the news, Jamarr was thrilled when he learned that she was pregnant.   He attended the birth and excitedly made plans with Tristina to share parenting responsibilities.   Theresa, in her letter to the Court, explains how much the child's birth meant to Jamarr, who was then trying to turn his life around after his release from state prison:

> He came home started working and he was doing good.   His girlfriend became pregnant with his first child.   He was so happy because he loves kids.   He babysat some of his ex-girlfriend's kids and all the children loved him.   He work with a lot of kids from around where we lived helping them with their needs.   He was always there to help people, I was very proud of him.
>
> When Jamarr got locked up his son was only 2 weeks old.   He was trying to turn his life around he use to tell me that all the time but then he went to jail.   He was very hurt because he didn't get to know his son.

(Ex. 1.)

After the birth, Tristina, Jamarr and the baby all went to Theresa's house to stay for a few weeks.   Theresa was overjoyed to have them in her home and to be a grandmother.

Tristina moved out after Jamarr's arrest, but she continued to take the baby to visit Theresa regularly, and Theresa and her daughters happily contributed to the baby's support. At some point, however, Jamarr and Tristina had a falling out.   The reasons remain unclear, but apparently relate to Tristina's anger that Jamarr had another girlfriend, even though Jamarr and Tristina had parted ways many months before the baby was born.

Other than the first two weeks at home, before his arrest, Jamarr has not been able to see or hold his son, who is now three years old.   Because he knows full well what it is like to grow up without a father, he has done everything possible to try to reach out to Tristina, but to no avail.   He is afraid that his son's mother will tell him that Jamarr abandoned him, and that his son will grow up believing that his father didn't want him.   Jamarr doesn't want his child to suffer in the same way that he did.

In August 2020, while Jamarr was incarcerated, his girlfriend Tajmia delivered a stillborn baby girl, whom she and Jamarr named Jamia.   To this day, Jamarr has no idea what caused the baby's death.   He was devastated when he learned about it and hoped that he and Tajmia would be able to grieve and mourn together, but that didn't happen.   Instead, she stopped communicating with him.

Jamarr's mother reported that following the baby's death, Tajmia sunk into a deep depression.   Jamarr also reported becoming very depressed and presented symptoms of a severe traumatic grief reaction.   Doctors at the MDC diagnosed him with Major Depression and prescribed Remeron (Mirtazapine).(*See* MDC medical records, Ex. 3 hereto.)[6]

Over the three years since his baby's death, Jamarr has had ongoing nightmares about death.   He dreams about the deaths of his friends and has had recurrent dreams of his faceless dead baby.   He is keenly aware of the losses he has suffered and is sick with remorse that his offense has kept him from seeing his surviving child and from mourning with Tajimia.

C.   Jamarr's Psychiatric History

The defense retained Dr. Sanford L. Drob to conduct a forensic psychological examination of Jamarr for purposes of mitigation.   A copy of Dr. Drob's report is annexed hereto as Exhibit 4 to the unredacted version of this letter, which will be submitted to the Court and the Government with a request that it be accepted for filing under seal.   Because of its sensitive content, Exhibit 4 is omitted from the publicly filed version of this letter.

Dr. Drob administered numerous tests, the results of which confirm a diagnosis of Attention Deficit Hyperactivity Disorder (ADHD) comorbid with Post Traumatic Stress Disorder (PTSD), Depression and Anxiety.   Dr. Drob also found that Jamarr's cognitive functioning to be in the "borderline" range.   The tests administered by Dr. Drob, and their results, are summarized below.



---

[6] Jamarr's medical records, Ex. 3, are omitted from the publicly filed version of this submission and are annexed to the unredacted version submitted to the Court with a request that they be accepted for filing under seal.



### III.      18 USC 3553(a)(1): The Nature and Circumstances of the Offense

There is no dispute that Jamarr's criminal conduct was serious, inexcusable, and worthy of punishment.   However, one cannot appreciate the circumstances of his offense without first understanding adolescent brain development and psychology.

A. Exposure to Trauma and Abuse as a Child and Adolescent

In Dr. Gordon's expert opinion, Jamarr's impulsive behavior and poor judgment are likely the predictable result of prenatal and perinatal stress, his being raised in a chaotic and abusive household, and the fact that he never received appropriate treatment for his mental and emotional conditions.   Each of these circumstances, standing alone, can cause cognitive delays and lead to heightened risk-taking, impulsivity, and aggressiveness in young adults.   Taken together, there can be no doubt that the tragic circumstances of Jamarr's life led directly to the circumstances that ultimately brought him before the Court for sentencing.

Jamarr's exposure to trauma started in the womb, where he was exposed to marijuana because his teenage mother—herself a victim of significant trauma, whose father was largely absent and whose mother was already a heroin addict—did not immediately realize that she was pregnant.   As is increasingly clear from the psychological literature, exposure to cannabinoids in utero is closely associated with deficits in memory, verbal reasoning, concentration, and attention, as well as increases in hyperactivity, impulsivity, and aggression. These effects arise even where, as here, the prenatal exposure was so early that the mother was unaware of her pregnancy.[7]   The negative effects of prenatal marijuana exposure frequently persist until at least the age of eleven or twelve, even in the absence of other exacerbating traumatic events.[8]

The high level of stress Theresa experienced in connection with the death of her Aunt Susie shortly before her pregnancy with Jamarr, and her separation from Jamarr's father early in her pregnancy, also likely contributed to his psychiatric conditions as a child and young adult, as did the stress and trauma Theresa and Jamarr both experienced when they moved to a shelter when Jamarr was an infant.   As is now clear from the scientific literature, fetuses whose mothers are stressed are exposed to heightened levels of cortisol and other stress-responsive hormones, and those heightened hormone levels have a significant and detrimental effect on the child that can last decades.   Specifically, children whose mothers suffer significant prenatal stress or trauma are at heightened risk of attention deficit and hyperactivity disorders, anxiety, and language delay.[9]

---

[7] Nashed, *et al.*, Prenatal Cannabinoid Exposure: Emerging Evidence of Physiological and Neuropsychiatric Abnormalities, 11 FRONTIERS IN Psychiatry (14 January 2021), available *at* https://www.frontiersin.org/articles/10.3389/fpsyt.2020.624275/full.

[8] Baranger, *et al*. Association of Mental Health Burden With Prenatal Cannabis Exposure From Childhood to Early Adolescence: Longitudinal Findings From the Adolescent Brain Cognitive Development (ABCD) Study. JAMA Pediatr. 2022;176(12):1261–1265, *available at* https://jamanetwork.com/journals/jamapediatrics/article-abstract/2795863.

[9] See, e.g., Talge, *et al.*, Antenatal maternal stress and long-term effects on child neurodevelopment: how and why?,

Glen's abuse of Theresa, which began when Jamarr was no more than three or four years old, also had a direct effect on Jamarr's development. As the psychologists Sandra Graham-Bermann and Alytia Levendosky explore in their book How Intimate Partner Violence Affects Children: Developmental Research, Case Studies, and Evidence-Based Intervention, exposure to physical or emotional abuse directed at a parent is linked to significant behavioral and emotional problems in children as young as preschool age. Specifically, those children's emotional responses to events are less appropriate than those of other children. They suffer higher rates of sadness, depression, anxiety, and frustration than their peers from nonviolent homes. They are more likely to express anger and frustration through violence, even when unprovoked, emotions and behaviors that Jamarr exhibited at school throughout his childhood and early adolescence. As many as 13% of preschoolers exposed to intimate partner violence meet all of the diagnostic criteria for Post-Traumatic Stress Disorder, a diagnosis Jamarr has received in adulthood, but for which he received no treatment prior to his arrest in this case.

Glen's abuse of Theresa very likely interfered with the maternal bond between Theresa and Jamarr, contributing to her minimization of Glen's abuse of Jamarr and the other children and to her years-long delay in reporting that abuse to the authorities. Significantly, clinical findings confirm that women who are exposed to domestic violence during pregnancy have significantly more negative representations of their infants and themselves as mothers. They are more likely to be "disengaged" or to interact with their children in an inconsistent and ambivalent manner, alternatingly disengaged and suffocatingly dependent. As a result, their children frequently have difficulty forming attachments and regulating their responses to social stressors.[10]

The direct physical and verbal abuse Glen inflicted on Jamarr was similarly damaging to Jamarr's neuropsychological development. Studies show that exposure to hostility and violence affects physical structures in the brain, including those responsible for transferring cognitive information between the brain's hemispheres, regulating emotion, and controlling abstract thought and decision-making. Coupled with the hormonal changes caused by verbal and physical violence, those physical changes hinder a child's ability to distinguish between strong emotions like fear, shame, and anger, and to self-regulate his behavior appropriately.[11] Recovery is possible with appropriate treatment, but Jamarr was denied effective treatment until his arrest in this case.

Adolescence is a difficult transitional stage of development, and most adolescents experience a great deal of turmoil as they struggle to come to terms with the demands they face as they transition from elementary to high school and from childhood to sexual maturity.

---

J. Child Psychol. Psych., 2007 Mar-Apr, 48(3-4):245-61.

[10] See, Alissa C. Huth-Bocks, et al, "The Impact of Domestic Violence on Mothers' Prenatal Representations of Their Infants" Infant Mental Health Journal, Vol.25 (2), 79-96 (2004). See also, Kami L. Schwerdtfeger and Briana S. Nelson, "Intergenerational Transmission of Trauma: Exploring Mother-Infant Prenatal Attachment" Journal of Traumatic Stress, Vol. 20 (1), 39-51, March 2007.

[11] See, e.g., Peg Streep, "The Enduring Pain of Childhood Verbal Abuse," Psychology Today, Nov 14, 2016, available at https://www.psychologytoday.com/us/blog/tech-support/201611/the-enduring-pain-childhood-verbal-abuse (last visited March 12, 2019).

---

Adolescence is a time of significant maturation of the brain, marked by structural alterations in many limbic and cortical regions such as the amygdala, hippocampal formation and the prefrontal cortex.[12]   Even in the absence of unusual circumstances, adolescent brain development is associated with major changes in emotional and cognitive functions as well as a rise in stress-related psychological disorders such as anxiety and depression.[13]

As recent research demonstrates, high levels of stress during an individual's adolescence predispose the individual to significantly elevated risk for dysregulation in affect, which in turn can result in clinical conditions, including anxiety, depression, personality disorders, and acting out/aggressive behavior, that continues into adulthood.[14]   Moreover, there is an ever-increasing body of evidence that even otherwise normal adolescents and young adults (ages 20-27) are less capable of controlling their impulses, exercising self-regulation, assessing and avoiding risk, and rationally considering alternative outcomes of their behavior than older adults. They are unable to consider the consequences of their actions, compared to adults, and are more susceptible to their peers' negative influences.   This is so because the frontal lobes of the brain do not reach full maturity until sometime in the mid-twenties, particularly the prefrontal cortex, which provides humans with advanced cognition and enables us to prioritize thoughts, imagine, think in the abstract, anticipate consequences and control impulses.[15]   In adolescents with ADHD, maturity of the pre-frontal cortex can be delayed as much as five years, even without the compounding developmental effects caused by trauma and cannabis exposure.[16]   In some cases, the brains of ADHD patients do not reach maturity until age 27, or even older.[17]

Jamarr began smoking marijuana at the age of thirteen, which likely contributed to his delayed psychological development.   According to a February 2019 study in the American Journal of Psychiatry, cannabis use in adolescence appears to cause cognitive impairments and developmental delays.[18]   In particular, cannabis reduces adolescents' ability to focus on relevant stimuli in the presence of irrelevant stimuli (i.e., to pay attention to teachers and focus on tasks) and to override strong but inappropriate behavioral tendencies, such as acting out in response to strong emotions.   Thus, when Jamarr began self-medicating with marijuana, the drug's effect

---

[12]  Russell D. Romeo, Ph.D. (2017). "The Impact of Stress on the Structure of the Adolescent Brain: Implications for Adolescent Mental Health." Brain Research. Volume 1654, Part B. 1 Jan. 201 pages 185-191.

[13]  *Id.*

[14] Nim Tottenham, Adriana Galvan (2016). "Stress and the adolescent brain: Amygdala -prefrontal cortex circuitry and ventral striatum as developmental targets, Neuroscience &Behavioral Reviews, Volume 70, 2016, 217-227.

[15] See Adolescence, Brain Development and Legal Culpability. ABA, Juvenile Justice Center, January,2004; Frances Jensen, M.D. &Amy Ellis Nutt (2015), *The Teenage Brain*. Harper, New York; Daniel M. Segal, M.D. (2015) *Brainstorm: The Power and Purpose of The Teenage Brain.* Tarcher/Penguin, New York.

[16] Brain Matures a Few Years Late in ADHD, But Follows Normal Pattern. The National Institute of Mental Health, November 12, 2007, Press Release

[17]  Russell E. Barkley, Ph.D. Executive *Functions:What They Are, How They Work and Why They Evolved.* (2012). Guildford Press, N.Y.

[18]  Morin *et al*, "A Population-Based Analysis of the Relationship Between Substance Use and Adolescent Cognitive Development," Am. J. Psychiatry 176:2 (February 2019).

was opposite to that of appropriate medication and treatment: it reduced his ability to focus, delayed his cognitive development, and reinforced his tendency to act out.

By the time Jamarr reached high school, the neurocognitive deficits that started at conception and were exacerbated by his severe head injury and ongoing exposure to trauma had culminated in an ADHD diagnosis, for which he was denied effective treatment.   In addition, Jamarr was learning disabled and socially immature, both as a result of the neuropsychological effects of a lifetime of physical and emotional abuse and as a consequence of his ADHD.[19] Desperate to be loved and for structure, he was easy prey and easily influenced by older adolescents and adult male role models by the time he was recruited into the Bloods in his early teens.

B.   Circumstances of Jamarr's Membership in the Bloods

Jamarr joined the Bloods when he was approximately fifteen.   The circumstances under which he became affiliated with the gang are particularly telling because they demonstrate the degree to which he was driven by a desperate desire for a network of peers and role models who understood the brutal circumstances of his home life, accepted him, and gave him the support and inclusion that he lacked growing up.

One night, Jamarr was at home with Theresa, who was unwell.   The residents in the apartment downstairs were playing loud music, and Jamarr went downstairs to ask them to turn it down.   An older man, known to Jamarr to be a Blood, answered the door, then disrespected Jamarr by turning the music up even louder.   Jamarr, who had been taught not to tolerate disrespect, and who had been raised to believe any slight was grounds for violence, gathered a group of friends to retaliate against the older man.   Before they did anything, however, a stranger (whom Jamarr later learned to be a Blood elder from Harlem) interceded to make peace, encouraging Jamarr and his friends to back down and instructing the older man to turn down the music.   The next day, the elder Blood came to Jamarr's apartment and invited him to join the gang, explaining that he was impressed by Jamarr's spirit and determination in confronting the noisemaker and in refusing to back down when insulted.   Jamarr had resisted joining the local chapter of the Bloods because he wanted to be a good role model for his younger siblings, but he found the Blood elder's respect intoxicating.   He accepted the man's invitation to join his Harlem crew, where his activities would not be observed by his younger siblings, whom he still hoped to protect.   He was pleased with his decision because the Bloods provided him with structure, protection, and a system of rules by which to live.   As he explained in an interview with Dr. Gordon,

> It was like having a big brother and I needed a big brother because
> I was getting bullied and jumped.   I had no older brothers, I thought
> the Bloods were cool, and then I was off to the races.   The gang had
> rules, and there were no rules in my house.   After my grandfather
> died I had no father or male role model.

---

[19] See DSM-5, pg. 59-63.

For Jamarr, who had ADHD and poor impulse control, being part of an organization that had rules was something he needed.  He was desperate to find acceptance, belonging and protection.   At that time, he viewed his membership in the Bloods as positive, but he now understands exactly how destructive his involvement has been, for himself, his family, and his community.   As Jamarr writes in his letter to the Court,

> [I'm] writing to You because Ive made a horrible Mistake.   During My time in prison Ive Met people who are Serving 40,50 years, life-long Sentences. I realized that I dont want to end up in that Position by being here its giving me time to think and reflect on my life and decisions. I know over the years i made alot of poor decisions in which i Seriously regret. I also want to Sincerely apoligize to the Victims and apologize For the pain and suffering I caused their Families.

(Ex. 5.)

Crime statistics show that adolescents typically commit crimes with peers, while adults more frequently commit offenses while alone. [20]   As such, one of the strongest predictors of adolescent delinquency is association with offending and delinquent peers.   Proximity to peers increases the adolescents' subjective valuation of potential rewards, resulting in an increase in risky behavior that yields short-term benefits and a decline in behavior aimed toward long-term value and safety.   Puberty-related hormone results in an increase of oxytocin receptors, and oxytocin has been linked to social bonding and heightened attention to positive social stimuli, and this factor may alter behavior in social settings during adolescence, because for adolescents, peer relations are more important and preoccupying than at any other phase of life.[21]

These findings help explain Jamarr's involvement in the Bloods, and how he was influenced to commit acts of violence in association with his peers throughout his adolescence and up until his arrest for this matter in 2022.  As noted elsewhere, he was rejected and bullied throughout his adolescence, and he desperately sought peer acceptance and belonging. His need for acceptance rendered him vulnerable to his peers' negative influences.

That Jamarr's offense conduct continued into his late twenties is unsurprising given the delays in maturity that typically result from stress, ADHD, and marijuana abuse—and indeed, even children who are not exposed to such factors typically mature much less rapidly than is commonly assumed.   For that reason, the law has long recognized that those who commit crimes before they are psychologically mature are less culpable than mature persons, and that the maturation process reduces the risk of recidivism.   In its *amicus* brief in *Roper v. Simmons*, the American Psychological Association wrote:

---

[20]Dustin Albert, Jason Chen & Laurence Steinberg. "The Teenage Brain: Peer Influences on Adolescent Decision Making. *Current Directions in Psychological Science,* April 2013 22:114-120.

[21]*Id.*

> Research suggests that the human brain does not settle into its mature, adult form until after the adolescent years have passed and a person has entered young adulthood.  Of particular interest with regard to decision-making and criminal culpability is the development of the frontal lobes of the brain.  The frontal lobes, especially the pre-frontal cortex, play a critical role in the executive or CEO functions of the brain which are considered the higher functions of the brain...  They are involved when an individual plans and implements goal-directed behaviors by selecting, coordinating and applying the cognitive skills necessary to accomplish the goal. ...  Neurodevelopmental MRI studies indicate this executive area of the brain is one of the last parts of the brain to reach maturity.[22]

The impulsiveness that even psychologically normal adolescents exhibit is not a result of moral choices or poor parenting.  To the contrary, it is a function of biology and of physical and neuropsychological maturation and development.

Jamarr's criminal history demonstrates that historically, he has lacked appropriate impulse control and has not always behaved rationally or appropriately weighed likely outcomes before acting.  However, those historical poor choices are the result of biology and developmental delays, rather than innate malice.  As Dr. Drob found when conducting his forensic psychological evaluation, Jamarr's cognitive limitations, emotional trauma, and family trauma "were factors that contributed to his decision to join a street gang and to engage in criminal violent activity."  (Ex. 4 at 14.)  As Dr. Drob further concluded,

> [Jamarr]'s decision to involve himself with the Bloods and their activities represented the grossly impaired judgment of an adolescent who was cognitively impaired, wanted to escape from a highly abusive home environment, was bullied by his peers, ad sought the support that was lacking in his home.  This decision was impacted by factors stemming from his specific psychological and neuropsychological deficits.  His willingness to engage in violence was conditioned by his cognitive and emotional impairments, his chronically abusive and under-socialized early environment, and the effects of peer pressure.  [Jamarr] is now quite self-reflective and has clearly moved on from his identification with the Bloods and his past violent actions.

(Ex. 4 at 15.)

In Dr. Gordon's opinion, Jamarr's prenatal exposure to toxins and stress hormones, the abuse and neglect he suffered as a child, his untreated mental illness, and his unfortunate attempt to self-medicate with marijuana had the effect of drastically delaying the maturation process.  Thus, although Jamarr was legally an adult at the time of his offense, his

---

[22] American Psychological Association, 2004, Amicus Curiae Brief in *Roper v. Simmons*, 543 US 551, pp 9-10.

psycho-social functioning was not that of a fully mature adult.   He was not capable of adult reasoning, and he is deserving of mercy for the same reasons that our society generally does not impose adult punishments on children and adolescents.

## IV.    18 USC 3553(a)(2): The Statutory Objectives of Sentencing

Having considered the history and characteristics of the defendant and the nature and circumstances of his offense, Section 3553(a) directs the Court to impose a sentence no greater than necessary to achieve certain statutory objectives, including the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; the need for general and specific deterrence; the need to provide the defendant with needed training, medical care, and correctional treatment in the most effective manner; and the need to avoid unwarranted sentence disparities among similarly-situated defendants.  It is respectfully submitted that a below-Guidelines sentence would be sufficient, but not greater than necessary, to achieve these objectives.

First, the sentence recommended by Probation is greater than necessary to reflect the seriousness of the offense, promote respect for the law and provide just punishment.   Over the past several years, American society has come to recognize that imposing draconian sentences on offenders who are capable of rehabilitation is ill-advised, both because of the human toll it exacts from such offenders and the economic cost it imposes on American taxpayers.

Second, Jamarr is unlikely to reoffend.   There can be no doubt that the horrific abuse and neglect that Jamarr suffered throughout his childhood and adolescence, coupled with his untreated ADHD and PTSD, were major contributing factors in his criminal conduct.

Jamarr is now 32 years old, and he is rapidly maturing.   Indeed, counsel has observed his personal growth and increased maturity over the course of this case, notably including a significant improvement in his ability rationally to evaluate unpleasant information, to integrate new information into his worldview, and to plan for the future.

Dr. Gordon, the mitigation specialist, has also observed Jamarr's significant personal growth and maturation during the life of this case, as she recounts in her report to counsel:

> Since my first meeting with Jamarr in March, 2020, I have observed ongoing changes and a level of maturity that was not present three years ago.   He regrets his involvement in the Bloods and as he said recently, "I have found meaning in my life since I became a Moslem."
>
> During the process of this mitigation evaluation that has stretched over a period of three years, he has courageously looked at his behaviors and the circumstances that led to his involvement in the Bloods.   He has taken an inventory of his life, including the loss of

his most significant relationships, Tajmia and their infant daughter, and his son.

Jamarr has managed to remain sober, (institutional sobriety) and he has expressed a wish to get into the NR DAP program. Now sober, he has taken stock of his life and wants to change. He wants to be able to complete his GED while incarcerated. He knows that he is facing a long sentence, but he has expressed a desire to work with children once he is released.

During the course of this mitigation process, Jamarr was very grateful for the psychoeducation that I provided regarding what it means to be diagnosed with Attention Deficit Hyperactivity Disorder. He mentioned that until this arrest, he did not know what that diagnosis meant. I also provided psychoeducation regarding what it means to have a diagnosis of Post-Traumatic Stress Disorder and the relation between that diagnosis and his assaultive behaviors.

Jamarr reported that while incarcerated at MDC, he had the opportunity to take part in a mindfulness training with an outside volunteer. He found that experience very important. I also taught him some breathing and relaxation exercises. He was open and receptive. It is noted that during those meetings with Jamarr, he sat forward and asked me to repeat things when he didn't understand.

I have noted that Dr. Drob recommended that while incarcerated, Jamarr be evaluated for anti-anxiety medication in addition to anti-depressant medication, and if necessary, medication for his ADHD. He also recommended psycho-education, and psychotherapy. I concur with Dr. Drob's recommendations.

Having concluded that Jamarr's involvement with the Bloods was the result of Jamarr's cognitive impairments, immaturity, and social environment, Dr. Drob finds significant reason to believe that Jamarr has moved past those factors as he has matured:

My experience with [Jamarr] is that he is clearly open to engagement in the psychotherapeutic process, and based upon the current assessment, he would benefit greatly from treatment focused upon working through the traumas he has experienced both in childhood and as an adult.

(Ex. 4 at 15.)

Theresa, too, has observed a change in Jamarr since he was released from state custody, and in particular since the birth of his son:

> I know all he wants to do is come home and be a father to his son because he didn't grow up with his dad.  He always said to me he wanted to be there for his kids because he knows how it feels not to have a father…   I always hear the remorse in his voice when we talk.  I know when he comes home he is gonna be a better person and be there for his son.

(Ex. 1.)

These subjective observations by counsel, mitigation specialist, forensic psychologist, and parent are consistent both with the science indicating that ADHD patients typically begin to reach full maturity at or around Jamarr's age and with the statistical studies that show a massive reduction in recidivism as defendants mature.  *See* The Effects of Aging on Recidivism Among Federal Offenders, U.S. Sentencing Commission, December 2017.   They are also worthy of substantial consideration when determining what sentence would be sufficient to meet the objective of individual deterrence.  *Cf. Gall v. United States*, 128 S.Ct. 586, 601 (2007) (noting scientific studies which "conclude that human brain development may not become complete until the age of twenty-five") (citation and internal quotation marks omitted); *Roper v. Simmons*, 543 U.S. 551, 570 (2005) (considering studies demonstrating that "the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside") (citation omitted).[23]

Jamarr's conversion to Islam is also noteworthy when considering the reasons why he joined the Bloods and whether he is likely to reoffend.  As discussed elsewhere in this submission, Jamarr found the Bloods appealing in large part because the gang's rules of conduct provided him with structure, which he otherwise lacked.   In his conversations with Dr. Gordon, Jamarr explained that he converted to Islam during his state prison term because it provided a safe, alternative means of structuring his life.   He said he was attracted to the religion because he views it as a religion of rules that can provide guidance at all times.   Similarly, in his letter to the Court, Jamarr explains how his religion has helped him grow and make plans to be productive after his release:

> I spend alot of my time reading and practicing My religon its teaching me patience humbleness but most importantly discipline. Upon release back into the Community i will seek out Opportunities to help at risk youths to deter them from incarceration and also enlighten them on how to not Make the same Mistakes as me.  I also spend alot of my time thinking about how im going to do things differentally when i get out this time.  I am not going to make the same Mistakes again.

(Ex. 5.)

---

[23]  Additional letters from members of the community, attesting to Jamarr's true character and potential, are annexed hereto collectively as Exhibit 7.

In short, Jamarr has turned a significant corner and there is good reason to be optimistic that he will not reoffend upon his release, especially if provided with appropriate counseling and other resources during his term of supervision.   A Guidelines sentence would therefore be far greater than necessary to provide specific deterrence and to protect the public from further crimes by Jamarr.

Third, the goal of general deterrence should play a lesser role than the other 3553 factors in fashioning an appropriate sentence in this case.   This case did not receive significant publicity and thus is not the proper vehicle for sending a message to the general public not to engage in criminal behavior similar to that in which Jamarr engaged.   Additionally, the general public is well aware of the draconian sentences that have been imposed on repeat offenders in the decades since habitual offender laws were adopted beginning in the early 1990s, but those draconian sentences (and the habitual offender laws themselves) have had little impact in deterring unlawful conduct among the general populace.   Indeed, as reflected in the bipartisan drive for criminal justice reform now underway across the country, habitual offender laws have, if anything, led to a public sense that draconian sentences are frequently unwarranted, and that better deterrence (and more just sentencing) can be obtained through the imposition of lesser terms of incarceration, coupled with incentives and opportunities to reform.

Fourth, a below-Guidelines sentence is necessary to ensure that Jamarr receives needed education and treatment.   As noted above, there is every reason to believe that Jamarr can overcome his history of mental illness, turn to a better path, and become a productive member of society if he is provided with the support and treatment he has historically been denied.   As noted in the PSR, Jamarr is taking medication for his conditions, and he has remained drug-free while incarcerated despite a lengthy history of marijuana abuse and several previous unsuccessful attempts to gain sobriety.   However, as the Court is well aware, the treatment resources available to incarcerated individuals pale by comparison to those available in the community.   A term of incarceration will therefore delay Jamarr's ability to obtain needed treatment.   Moreover, if the Court imposes a very lengthy sentence on Jamarr, he is likely to exhaust the available educational programs available in the BOP system, thus leaving him to serve an extended period without meaningful opportunities at growth or rehabilitation.   By contrast, the Probation Department has a substantially greater ability to provide people on supervised release with access to treatment programs geared to their specific needs and to oversee treatment and ensure that the desired ends are being met.   Accordingly, the Court can best provide Jamarr with needed medical care and correctional treatment by imposing a below-Guidelines term of incarceration to be followed by a significant term of supervised release.

Fifth, the need to avoid unwarranted sentence disparities among similarly situated defendants supports the imposition of a significantly below-Guidelines sentence on Jamarr.   To date, the sentences imposed on Jamarr's co-defendants range from 27 months to 8 years.   Although Jamarr's role was undeniably among the most serious, and therefore warrants the imposition of a stiffer sentence than most, it does not justify a sentence that is four times as long as the 8-year sentence imposed on Timothy Coleman, who pleaded guilty to the racketeering conspiracy charged in Count One.   Coleman admitted in this Court that he engaged in violent assaults in furtherance of the enterprise, and he was charged in the Bronx with attempted murder. Unlike Jamarr, he was not charged federally with attempted murder, and did not plead guilty to

attempted murder in this case.   Imposing on Jamarr the PSR's recommended sentence of 360 months would therefore result in an unwarranted discrepancy.   Additionally, as the Court well knows, many murder cases in this District are resolved with sentences significantly below thirty years.   Imposing a sentence of thirty years on Jamarr would thus result in an unwarranted sentencing disparity between him and those convicted of more serious offenses who have been sentenced to significantly less time in prison.

Another consideration relevant to the potential for unwarranted discrepancies arises under the First Step Act, which requires the Bureau of Prisons to establish a system by which inmates can earn sentencing credits for participating in vocational training and other programs designed to reduce recidivism.   If Jamarr is incorrectly deemed a career offender, he will be forbidden from redeeming earned credits toward early release.   Accordingly, whatever sentence he receives will in effect be longer than an equivalent term imposed on a defendant not classified as a career offender.   This consideration, too, warrants the imposition of a reduced term of imprisonment, coupled with a term of supervised release conditioned on Jamarr's participating in appropriate programs while under supervision.

Finally, the Court should be mindful that Jamarr was arrested in January 2020 and has been incarcerated since that time.   He was at the MCC for the peak of the pandemic.   When that facility was closed because its conditions were so irreparably inhumane, he was transferred to the MDC.   He has been at the MDC for the remainder of the pandemic and for the regular lockdowns that have occurred ever since.   For the first year of his imprisonment, he was entirely unable to have visitors.   The Court is well aware of the brutal and inhumane conditions that predominated at the MCC and MDC during the pandemic years, and of the cruel lockdowns that have continued since.   This Court, like other courts in this District and across the river, has given the inhumane conditions of confinement experienced by inmates at the MCC and MDC during the pandemic significant weight when crafting an appropriate sentence, and has imposed reduced sentences on defendants to account for those conditions.   This Court should consider the horrific conditions under which Jamarr has been held and impose a reduced sentence to account for the harshness of his conditions of confinement.

## V.    The Defendant's Objections to the PSR

The defense raised several objections to the PSR, by letter dated February 14, 2023, that were not incorporated in the final PSR.   A copy of the objections is annexed hereto as Exhibit 8.[24]   Counsel respectfully requests that the Court, at sentencing, direct that the PSR be amended in accordance with the defendant's objections.

---

[24] Because the PSR is a nonpublic document, Exhibit 8 is omitted from the publicly filed version of this submission.

## **Conclusion**

For all of the reasons stated above, it is respectfully submitted that a substantially below-Guidelines sentence would be sufficient but not greater than necessary to accomplish the objectives set forth in §3553(a).

Respectfully Submitted,

Avraham C. Moskowitz
Deborah A. Colson
Christopher R. Neff


cc:   AUSA Adam S. Hobson
      AUSA Michael D. Longyear
      AUSA Jacob E. Warren
      AUSA Peter J. Davis
      AUSA Rushmi Bhaskaran